[Opinion delivered May 24, 1880.]

Posey.
1p 287
80  626

## W. H. LEE v. W. G. & J. B. WILKINS.

(Case No. 3497.)

1. RECONVENTION.—In a suit on a promissory note, the defendant may plead in reconvention matters of which the note formed a part, and by which damages are alleged to have been inflicted upon him by the plaintiff.

2. PLEADINGS — AMENDMENT — LIMITATION.— An amendment to a plea in reconvention, which begins:

> "And now come the defendants, and by leave of the court, amending their pleadings, withdraw their answer and plea in reconvention, heretofore by them pleaded." . . . "And defendants, now answering plaintiff's petition, say that they admit the execution of the note, to recover which this suit is brought," followed by a restatement of the plea withdrawn, with the addition of some facts, is not a new plea, and limitation does not apply as if the pleading had been first filed as of the date of filing the amendment.

3 EVIDENCE — PARTIAL TRANSCRIPT.— A partial transcript of proceedings in a suit is admissible in evidence where the entire transcript would be admitted. 29 Tex., 727; 9 Tex., 300.

4. PRACTICE — INADMISSIBLE EVIDENCE.— Permitting a party to read in evidence, over objection, questions and answers in the depositions of a witness, as follows:

> "Can you give an estimate of the pecuniary damage which the defendants sustained by reason of the said attachment proceedings?" Ans. "That is rather a difficult question to answer. Merely as a matter of opinion as a business man, I should say that their pecuniary injury up to this time, as a result of the said proceedings, was not less than $25,000 currency," was erroneous. 50 Tex., 104.

5. CHARGE OF THE COURT — SET-OFF AND RECONVENTION.—A charge of the court in a suit on a note where damages for suing out an attachment are pleaded in reconvention, which instructs the jury that "The plaintiff is entitled to recover the amount of the note sued on, and interest, which is to be offset by such damages (if any) as may be awarded by the jury to the defendants under their plea in reconvention," is erroneous, because confounding the right of set-off with the plea in reconvention.

6. CHARGE ON WEIGHT OF EVIDENCE.— Instructing the jury that "Any settlement or compromise between the parties after the levy of attachment would be binding to the extent of such settlement and compromise, but the giving the note sued on and the payment of the $600 by the defendants would not release the damages claimed by them in this suit, unless they were expressly and unequivocally released by the defendants, and the burden of showing such release is on the plaintiff," is improper, because a charge upon the weight of evidence, and for the reason that no such degree of certainty is required by law in civil cases.

7. ATTACHMENT — DAMAGES FOR WRONGFUL ISSUANCE.— Damages for the wrongful suing out of an attachment are limited to the natural and proximate result or consequence of the attachment.

8. ATTACHMENT, WHEN WRONGFUL.— An attachment is wrongfully sued out when issued against a partnership for an individual debt

of one of the members, instead of the interest of the partner in the firm property.

9.  Damages — Principal liable for acts of the agent. — A principal is not liable for his agent's malice, but is liable for actual damages for the acts of his agent in wrongfully suing out an attachment.

10. Damages for attorney's mistake. — The mistake of an attorney in instituting attachment proceedings will subject his client to damages for wrongfully suing out the attachment, but will not form a basis for exemplary damages.

11. Paying note to Confederate States' receiver. — Payments made during the war to Confederate States receivers under the Confederate States sequestration laws were only voluntarily made and not enforced beyond current interest, and could not affect the rights of the owner of a note so paid to any extent beyond such interest.

Error from Washington.  Tried below before the Hon. I. B. McFarland.

May 12, 1873, Lee brought suit on a promissory note executed by defendants for $800, September 26, 1872, and due six months thereafter.

May 24, 1873, defendants answered, pleading payment; want of consideration; in reconvention that they in August, 1872, were merchants in good standing and credit, doing a good business in Washington county, Texas, and that they had bought in New York city a large stock, $30,000 worth, of goods; that said goods, or about $10,000 worth thereof, were seized under attachment proceedings instigated and begun by Lee; the seizure being wrongful, and the proceedings malicious; damages, $50,000; special damages also alleged — attorney fees, costs, depreciation of goods in value, or that the note sued on was made to relieve said goods from seizure, and that to obtain the release of said goods from such seizure, defendants had paid to Lee $600; and had made the note sued on; prayer to cancel the note, recovery of the $600 paid, and for damages, etc.

March 13, 1874, plaintiff amended, giving a history of the transactions pleaded in reconvention; that in 1860 James A. Wilkins, W. G. Wilkins and J. B. Wilkins were partners in business in Brenham under the name "Wilkins & Bro.," and as

such being indebted for merchandise purchased of Emerson, Brewster & Co., of New York, executed to them February 7, 1860, their promissory note for $1,200.65, and due twelve months thereafter; that at commencement of the war the note was left with McMahon & Gilbert, and by them delivered to W. P. Ballinger, a Confederate States receiver, and was confiscated, etc.; that November 3, 1863, Emerson, Brewster & Co. having failed, their assets were sold by their assignee, and in such sale the said note on "Wilkins & Bro." was bought by plaintiff; that plaintiff had made many efforts to collect it — non-payment; that since the war the makers had proposed to plaintiff a compromise of twenty-five cents on the face thereof, which he refused, asking fifty cents per dollar. That in 1872 plaintiff brought an attachment suit in one of the courts in New York city, and caused seizure of property of W. G. & J. B. Wilkins; that while said property was in custody plaintiff received a letter, of date September 11, 1872, from W. G. Wilkins, asking a compromise to this; and September 20th plaintiff telegraphed in answer: "Face of claim and costs; half cash, half indorsed note, approved, six months." To which September 24th plaintiff received reply by telegram — an acceptance. That through Bassett & Bassett, bankers, the cash was paid, and the note sued on executed; and that plaintiff accepted the same, thinking the note secured, and at once released the levy upon the goods; and on receiving the money and note plaintiff dismissed his suit and canceled his debt against Wilkins & Bro., all of which was done in good faith; and that this was agreed to be and was a settlement of all matters growing out of the note on Wilkins & Bro., the attachment suit and the levy of the attachment. . . . That relying on the good faith of defendants, he compromised; said compromise was intended to and did include all matters of difference between plaintiff and defendants. That the note was executed as part of said compromise; . . . plaintiff specially denied malice in bringing the attachment suit, or in levying on the property of defendant as aforesaid, or that he had any other motive than a desire to collect what was honestly due him, etc.

September 28, 1874, defendants amended — the amendment beginning as follows: "And now come the defendants, and by leave of the court amending their pleadings, withdraw their answer and plea in reconvention heretofore by them pleaded."

"And defendants now answering plaintiff's petition, say that they admit the execution of the note, to recover which this suit is brought."

Then follows a restatement of the plea in reconvention, with addition of some facts pleaded in aggravation; damages at $100,000. (The details in some parts of the plea will be noted.)

October 6, 1874, plaintiff excepted to the plea in reconvention; replied by general denial and plea of limitation of two years.

October 6th defendants amended, alleging that Lee, the plaintiff, is a resident of the state of New York, and had not been in the state of Texas within two years.

Same day plaintiff applied for a continuance. The defendants withdrew parts of their allegations in plea filed September 28th, and the application was thereupon overruled.

The court allowed to defendants the right to open and conclude.

The facts as contained in eighty-six pages of the transcript, in substance, show: Affidavit for attachment by Jas. Holliday, agent, on account, $1,160.05, and interest from August 7, 1860, for goods, etc., sold by Emerson, Brewster & Co. to Wilkins Bros., February 7, 1860; that said claim had been sold October 8, 1863, to plaintiff, in suit by W. H. Lee v. W. G. & J. B. Wilkins; attachment bond and writ in said suit are of date August 23, 1873. It was shown that, under the attachment, twelve cases of goods of W. G. & J. B. Wilkins had been seized, in value estimated from $3,000 to $10,000.

Witness Dulaney, for defendants, testified that previous to the attachment Wilkins & Wilkins were in good standing in New York — had good credit; that the stock purchased and seized was paints, oils, hardware, dry goods and general

merchandise; that effect of the seizure was to ruin their credit. Over objection was asked, "Can you give an estimate of the pecuniary injury which the defendants sustained by reason of the said attachment proceedings?" Ans. (over objection). "That is rather a difficult question to answer. Merely as a matter of opinion, as a business man, I should say that their pecuniary injury up to this time, as a result of the said proceedings, was not less than $25,000 currency."

Hugh Haynie testified to great injury likely to result from such proceedings. He was a drummer for a New York house, engaged in Texas trade.

Jas. Haynie, drummer for New Orleans house, in Texas, testified to internal workings of mercantile agencies in disseminating news of failures, etc.

Jas. A. Wilkins testified that defendant, Jno. B. Wilkins, was not a member of Wilkins & Bro. in 1859–1861; at latter date was seventeen years old. Witness, Jas. A. Wilkins, and W. G. Wilkins composed that firm, and gave a note to Emerson, Brewster & Co. for $1,200.05 in 1859, for goods. That the note was confiscated by the Confederate States; in 1864 he paid the notes in Confederate money to J. D. Giddings, Confederate States receiver, and took up the note and still has it. In 1866 he was in New York and requested J. M. Wardwell to see plaintiff Lee and offer him a compromise on said note, which Mr. Lee declined. After the war W. G. & J. B. Wilkins went into business on their own account, and witness on his account.

*Cross-examination:* In 1872 witness failed, and made an assignment for benefit of creditors with W. H. Thacker, assignee.

Defendant W. G. Wilkins testified as to old firm "Wilkins Bros.," same as J. A. Wilkins, and continued: We (witness and J. B. Wilkins) were in business together in 1872; were in habit of buying from $30,000 to $50,000 worth of goods per year. Profits were about twenty-five per cent. I was in New York in August, 1872; had just bought about $30,000 worth of goods for firm and come home.

After I left for home, about $10,000 worth of the goods

were attached and detained about sixty days. When they reached Brenham, the season was far advanced; goods unsalable and depreciated in value not less than $5,000. Our business was broken up by the attachment in New York. Prior to that time we could buy all the goods we desired at New York. Our credit was good. We had to quit business, and did quit in fall of 1872, after the levy. Other creditors came down on us in consequence. One began proceedings in bankruptcy against us and we were compelled to pay the debt and costs in full, but also his attorneys' fees, $300, for filing the petition. Both witness and J. B. Wilkins were bred as merchants; . . . paid Sayles & Bassett's $1,000 fee; paid $400 costs to Lee; spent $350 telegraphing and traveling expenses.

*Cross-examination:* I suppose our credit was ruined in New York. I was told by merchants with whom we had dealt that it would be useless to apply for credit, and we have not tried to get anything on credit since the levy. (Witness gave list of his debts secured by mortgages, and of debts and of assets.) "Think we could have worked out; could not say we were solvent August 1, 1872. Nobody else pressed us till after the levy of the attachment. We afterwards sold out at cost in store in Brenham less ten per cent., on six, twelve and eighteen months' time. We compromised with our creditors at sixty cents per dollar, and paid them in the paper received for the goods, and they released us. Have not gone into business since. . . ."

J. D. Giddings testified: "Am an attorney; testified as to attorney fees, that $250 would be reasonable in releasing the attachment. . . . The defendants had an open account at my bank prior to 1872. In August, I believe we had a deed of trust to secure us; but their credit was not limited to the value of the property covered by it."

Jefferson Bassett, banker: "Knew defendants did a large business; often had their commercial paper for collection. They generally paid promptly; had good credit with witness; let them have money when they wanted it; considered their credit good prior to the levy in 1872. The levy injured their credit as merchants and business men."

*Cross-examination:* Sometimes their paper was not paid; in such cases it was renewed and extended. Heard their solvency talked about prior to the levy as other business men's solvency was talked about.

The plaintiff, Lee, testified: Witness on October 8, 1863, bought of assignee of Emerson, Brewster & Co., a promissory note for $1,200.05, of date February 7, 1860, due twelve months, signed "Wilkins & Bro." The note, copy of which was produced, was in hands of McMahon & Gilbert, Galveston, Texas. In winter of 1866, J. M. Wardwell called on me and stated he was authorized to settle the claim at twenty-five per cent.; I declined, asking fifty per cent.; had made no settlement of the claim before the attachment. . . . I placed it in the hands of an attorney here, who commenced an action about August 1, 1872, against Wilkins, to secure the amount of said note, and caused an attachment to issue against the goods of W. G. & J. B. Wilkins. Witness exhibited to his testimony a letter written to him by W. G. Wilkins, about September 20, 1872, relating to the matter of the attachment and the debt, and his efforts to settle old debts, closing as follows: "I ask you to be generous with me, and let me know by telegraph the best offer you can or are willing to make."

Witness answered by telegram: "Face of claim and costs; half cash, half indorsed note, approved, six months."

There was correspondence between Bassett & Bassett touching the money. The goods, twelve cases, were released 27th September, and reached Brenham 7th October, 1872.

The note sued on, executed September 26, 1872, with the cash, was then forwarded to plaintiff.

On cross-examination, plaintiff substantially stated he placed the note for $1,200 in the hands of an attorney, authorized to collect the debt any way he could. The goods were kept until 26th or 27th September. The marshal who seized them valued them at $3,000. The goods were released upon being notified of payment of $600 and making note, etc.

M. Bunker, for plaintiff, testified: Am of firm of Benedict, Hall & Co.; knew W. G. and J. B. Wilkins; our firm used to sell goods to them; did not do so in August, 1872.

"My firm refused to sell them, as they were not prompt in paying their bills, and on referring to other merchants they gave some reports that they were behind in their payment;" would not have sold them on credit; refused to sell to them, because they had not paid promptly, and it was reported that they were behind with other houses; their credit was not affected by the attachment, as they were behind in payments and not considered prompt. An attachment of itself would not impair their credit, if in good standing and credit; would not affect credit unless house was behind and not in good credit; the attachment was not the cause of failure; judge that they were not in sound condition. . . .

James Holladay, book-keeper, testified that he made the affidavit for attachment, at request of attorney. The copy of note is from books of Emerson, Brewster & Co., which note had not been paid; information from the books, etc.

J. M. Wardwell, witness, was asked to call on Lee to settle a note for $1,200 to Emerson, Brewster & Co., and then owned by Lee; offered in behalf of Wilkins & Bro. twenty-five per cent., being so authorized by James A. Wilkins. Lee would not take less than fifty per cent.

*Cross-examination:* Witness stated that in 1872 W. G. & J. B. Wilkins did not stand very high in credit; their credit was fair; they were not considered prompt; it was considered they speculated too much; think they could have bought goods on credit after the attachment, etc.; Lee is a man of wealth and character; James A. Wilkins authorized me to call on Lee, but I acted for Wilkins & Bro., and so stated to Lee; J. A. Wilkins requested me at Merchants' Hotel in winter of 1866; he was sick and asked me to attend to their claims; J. A. Wilkins did not tell me the note had been paid, and was in his hands; on the contrary, he told me Wilkins & Bro. owed the debt and wanted me to settle it with William H. Lee.

In the statement of facts was inserted letter of Lee to defendants, of date September 3, 1872, notifying them of the attachment, etc., as follows:

"DEAR SIR: I presume by this time you have heard that I have attached your interest in all the goods you lately purchased here. As I wish to deal fairly and openly with you, I think it as well to explain to you the position you are now in.

"If the debt is not settled, of course we shall be compelled to sell your goods; by doing which, I shall be compelled to put you to unnecessary trouble and expense, for the marshal and attorney fees must first come out of the proceeds of the sale before one cent can be applied to liquidate the debt. These charges will amount to $300 or $400, which will be a dead loss to you and no gain to me; it simply goes to enrich the lawyer and the sheriff. Now, all I want is to have my debt paid. By your not paying it, you see you lose from $200 to $400, and the debt remains as large as ever. I am advised you are well able to pay it, and am surprised I have not heard from you in reference to it before this. You must not think I have attached these goods for the purpose of giving you trouble. I have been ten years trying to collect this debt, and have pursued this course as the only one left to me.

"I have now acted fairly and openly with you; do you look at this matter in the same light, and we may yet come to a settlement. Let me hear from you at your early convenience, as I do not wish to sacrifice your goods for nothing.

"Yours respectfully,

"W. H. LEE,<br>"Per W. H. WALKER.

"Mr. W. G. WILKINS, Brenham, Texas."

(To this letter Wilkins replied, noticed above, resulting in the transactions releasing the goods.)

W. H. Thacker testified: On September 14, 1872, J. A. Wilkins made an assignment to witness for the benefit of his creditors; that one of the claims provided for in such assignment is a claim for $2,313.72, as follows: "W. G. Wilkins, Brenham, on *assumpsit*, to Emerson, Brewster & Co., $2,313.72;" which claim is owned and held by W. G. Wilkins. Witness has paid on this claim a *pro rata* of six-

teen per cent., and holds assets probably sufficient to increase the payment to twenty per cent. Witness was cashier of Breedlove & Chadwick's bank in 1872. Knew a good deal of the financial standing of W. G. & J. B. Wilkins in 1871 and 1872. In summer of 1872 heard their solvency discussed. Monied men considered them shaky.

Geo. Seward testified: Was formerly a merchant in Brenham; heard the solvency of W. G. & J. B. Wilkins discussed in 1872. Heard several persons from the country around, and some in town, doubt their being able to continue in business much longer.

C. C. Herring testified: Is cashier of Giddings & Giddings' bank. Knew a good deal of the condition of the business of W. G. & J. B. Wilkins in 1872. . . . Knew they were hard up and borrowing all the money they could get at two and one-half per cent. per month. Heard their solvency discussed, and heard it doubted by several persons.

The charge of the court is noticed, so far as necessary, in the opinion. Many instructions were asked by the plaintiff and refused.

The jury returned a verdict as follows:

"We, the jury, find that the attachment was wrongfully sued out, and that the defendants were actually damaged in the sum of $5,250 less the note, with interest, $898.66, leaving $4,351.34. And that, in addition to it being wrongfully done, that it was maliciously done, without a due regard for the rights of others, and assess the damages at $10,000."

Upon which verdict judgment was entered for the defendants for $14,351.34, and costs of suit.

A motion for a new trial was made, for the rulings of the court, and because verdict was unsupported, etc. By amended motion, supported by affidavit, *new testimony* was shown as material, being additional transcript in the suit in New York of W. H. Lee *v.* Wilkins & Bro., in which it was shown that, by proceedings had in the suit, the mistake in the name of the defendant, J. B. Wilkins, had been corrected throughout the proceedings, thus making the suit by Lee *v.* W. G. & J. A. Wilkins, who really formed that firm; that affiant did not know it at the trial.

The motion was overruled. An appeal was dismissed and the plaintiff brought the case for revision by writ of error, assigning as errors:

1. The court erred in its ruling (1) upon plaintiff's exceptions to the plea of reconvention and (2) upon the plea of limitations.

2. Error in admitting illegal testimony. (1) The partial transcript of the attachment proceedings. (2) The testimony (as to opinion) of witness Dulaney.

3. In the charge to the jury, especially clauses 2, 3, 5, 10, 11, 12 and 13.

4. In refusing all the charges asked by plaintiff.

5 and 6. Verdict was contrary to the law and evidence.

7. Error in giving the opening and conclusion of the argument to defendants.

8. Overruling motion for new trial.

9. Overruling motion in arrest of judgment; upon alleged insufficiency of the verdict.

*Breedlove & Ewing*, for plaintiff in error.

*Sayles & Bassett*, for defendants in error.

A. S. WALKER, J.— 1. The plea in reconvention set up matters, of which the note sued on formed a part, and by which damages are alleged to have been inflicted by plaintiff upon defendants. The acts so pleaded are necessarily connected with the note sued on. The exceptions to the plea were properly overruled.

2. The amendment of 28th September, 1874, cannot be regarded as interposing in fact a new plea. It is an amendment omitting a part of the former answer, repeating the substance of other parts, adding circumstances and details. The main facts are the same in the plea of reconvention as amended as in the original. There was no point of time since its original filing when the plea was not on file. That the words prefacing the statements in it admit of a construction different from the actual facts should not give to the amendment the effect, as we think, of affording the benefit of limitation against the plea as if filed on that day.

3. That only a partial transcript of the attachment proceedings in case of W. H. Lee *v.* Wilkins & Bro., or W. G. & J. B. Wilkins, was produced, was not a reason for its rejection as evidence. The use of duly certified transcripts of parts of proceedings had in the same estate in the probate courts has been sanctioned. Guilford *v.* Love, 49 Tex., 727; Townsend *v.* Munger, 9 Tex., 300. The reasoning in these cases is general, and applies with equal force to the testimony offered and admitted in this case.

4. The bill of exceptions shows that objections were made to questions and answers in the depositions of the witness Dulaney; the more important is the tenth: "Can you give an estimate of the pecuniary injury which the defendants sustained by reason of the said attachment proceedings?" Ans. "That is rather a difficult question to answer. Merely as a matter of opinion as a business man, I should say that their pecuniary injury up to this time as a result of the said proceedings was not less than $25,000 currency." It appears that objections to the question were overruled and the answer was then read. "The court then remarked that 'the answer was not proper testimony.' No further notice of the matter was taken by the parties, and the evidence was not withdrawn from the jury further than was implied in the remark of the court."

This is the condition most favorable to the defendants. The evidence was not admissible. The objections to the question should have been sustained. The answer was read as evidence, and no caution was given to the jury by the court to correct its effect, nor does it appear that the remark by the judge was made in hearing of the jury. The admission of the answer was error and its effect was not corrected. Clardy *v.* Callicoate, 24 Tex., 170, and cases cited; Hunt *v.* Riley, 50 Tex., 104; Wharton on Evidence, sec. 509.

5. Several of the instructions given by the court are subject to criticism.

The third paragraph shows a confusion of ideas — confounding the right of set-off with the plea in reconvention. "The plaintiff is entitled to recover the amount of the note

sued on and interest, which is to be offset by such damages (if any) as may be awarded by the jury to the defendants under their plea in reconvention." Had such been the legal effect of the plea it should have been set aside on the demurrer of the plaintiff to it. The plea in reconvention extended to and explained the consideration of the note; and while in reaching results the jury may have taken some such process in their labor, it was not a matter of law upon which they should have been instructed. Pas. Dig., 3447.

6. The fifth charge of the court we think was properly given, unless, perhaps, the damages should have been limited to the "natural and proximate result or consequence" of the attachment. Drake on Att., § 175. The charge was: "If the attachment complained of was wrongfully sued out, the defendants are entitled to recover such actual damages as the proof shows they suffered in consequence thereof." The unlimited *consequences* as constituting the matters upon which damages should be computed may have injured the plaintiff.

7. The tenth charge, and which is assigned as error, is as follows: "If you believe from the evidence that the attachment was issued against W. G. & John B. Wilkins, on a debt due by James A. Wilkins & W. G. Wilkins, then the attachment was wrongfully sued out."

This charge is warranted by the pleadings and the evidence, and we think it correct and the law in such case. The other hypothesis, that the suit was properly brought and the attachment ran against the interest of W. G. Wilkins, may have been given. The testimony actually before the jury was not sufficiently explicit to render the failure to submit this erroneous.

8. The eleventh charge is: "A party is bound by the acts of his agent, and more especially so if, after full information, he approves or ratifies the acts of his agent or fails to repudiate." This, as a general proposition, is law. In this case it was liable to be applied to the injury of plaintiff, unless it had been modified by the explanation; and that the natural result of such liability was only for the wrongful

act and not for malice of the agent. Wallace *v.* Finberg, 46 Tex., 50, and cases cited. The evidence as to the agency is that the claim was placed in the hands of the attorney for collection, with authority to collect. There is no evidence of W. H. Lee's actual knowledge of the errors and mistakes of the attorney.

9. The twelfth charge asked, relating to the existence, etc., of a settlement, is as follows:

" Any settlement or compromise between the parties after the levy of attachment would be binding to the extent of such settlement and compromise; but the giving the note sued on, and the payment of the $600 by the defendants, would not release the damages claimed by them in this suit, unless they were expressly and unequivocally released by the defendants; and the burden of showing such release is on the plaintiff."

The statute requires that the judge " shall frame his charge so as to submit questions of fact solely to the decision of the jury." " He shall not in any case charge or comment on the weight of evidence." Pas. Dig., 1465. It was a question of fact whether there had been a settlement or compromise. It was proper that that fact should be submitted to the jury. That the note on its face was not a release of damages was properly enough told the jury, if it had been so given. But that the giving of the note sued on and the payment of the $600 by the defendants, under the facts in evidence, was or not a release, or whether the transaction was a settlement, was a question *of fact*, and a most material issue. The court therefore encroached upon the work of the jury when they were told that they "*would not* release the damages claimed." Besides the jury were instructed that the burden of showing a release of the damages, expressly or unequivocally made, was upon the plaintiff. Whether the emphatic words, "expressly and unequivocally," be applied to the quantity of proof, or the mode of showing the release, or to the terms of a contract for release (for they may apply to either), they apply to the work of the jury a degree of certainty not required by the law in civil

cases. The release could be proven, as any other fact, with reasonable certainty and with preponderance in testimony. This instruction was erroneous, and likely to injure the plaintiff.

10. The thirteenth charge is only subject to the criticism urged against the third. It cannot be regarded as having been injurious to plaintiff.

11. The fourth assignment of errors is the general one that the court erred in refusing the charges asked by the plaintiff. The instructions were numerous. The third and eighth ought to have been given as explanatory of the corresponding charges given. It may have been proper to have given the ninth, relating to payments made during the war to Confederate States receivers. Such payments under the Confederate States sequestration law were only voluntarily made, not enforced beyond current interest, and could not affect the right of the owner to any extent beyond such *interest*, even allowing to the Confederate States sequestration proceedings all the validity that could be claimed for them. Simpson *v.* Foster, 46 Tex., 623.

12. The fifth, sixth and eighth errors question the propriety of the verdict under the law and evidence.

The statement of facts shows that Lee was the holder and recognized owner of a debt on Wilkins & Bro.; that one of the members of the firm had sought to compromise it with him since the war; that the same member of the firm, in his assignment for the benefit of his own creditors, provided for the payment of this debt in the hands of W. G. Wilkins, one of the defendants in this suit. This must either have recognized W. G. Wilkins' ownership in the Emerson, Brewster & Co. debt or was an attempt to provide funds in his hands for its settlement. (This repudiated any ownership through the Confederate States receiver proceedings, as J. A. Wilkins himself had paid Giddings and had taken up the note.)

The claim had been placed in the hands of an attorney by plaintiff at New York for collection; there was property in New York of W. G. Wilkins subject to attachment; the

attorney took proceedings for the purpose, but by some carelessness did not set out the *full amount* in his suit, nor obtain the full names of the firm of Wilkins & Bro.; attachment was issued and levied upon property, one-half interest in which was subject to the attachment if regularly sued out. The amount in value of the goods seized are stated by one at $3,000 and by another at about $10,000. On the seizure plaintiff wrote to the defendant W. G. Wilkins of the attachment, the costs likely to be incurred, and suggesting settlement; to this defendant replied stating his efforts to settle the old debts of the firm of Wilkins & Bro. and asking a reduction, etc. To this the plaintiff responded, making a reduction of about fifty per cent. of the amount actually due, half cash, balance on time. This was accepted, and the release of the goods was to follow; the money and note did not leave Brenham until the goods reached the defendants. They had been seized the 23d of August, 1872, and were released September 27, and actually reached defendants October 7, 1872. The defendant W. G. Wilkins, who had advanced the money, was at once or had already been provided for by J. A. Wilkins among his creditors, and from which twenty per cent. appear to have been realized.

The plaintiff in his letter expressed his intent as not to injure defendant but to obtain his debt; his settlement does not contradict his statement. The mistake of his attorney in the attachment proceedings, while subjecting defendants to damages for the wrongful suing out the attachment, should not form the basis of exemplary damages. For the payment and note, defendant W. G. Wilkins had his goods released, and his old debt, for about double the amount paid, canceled.

To the extent of exemplary damages we think the verdict not sustained by testimony.

13. The motion for new trial, while showing material testimony, does not excuse want of diligence. The testimony of the complete record in the attachment proceedings might not correct the effect of the seizure as wrongful, yet it would show that the purpose was to pursue *the real* parties and

to subject such property only as would be liable to seizure under the amended proceedings and writ. It might be of importance on questions of exemplary damages.

14. The subject of practice in regard to the right to open and close has been discussed in cases from the same district court, and reference is made to the case of Franklin *v.* Smith *et al.*

For the error in the admission of the testimony in allowing witness Dulaney to give his opinion as to the amount of damages, the errors in the charges of the court noticed above, and because the verdict as to vindictive damages is not supported by the testimony, the judgment below should be reversed.